**HATCHER CLEANING COMPANY and Richard B. Schiro, Appellants,**

v.

**COMERICA BANK—TEXAS, Appellee.**

No. 2–98–325–CV.

Court of Appeals of Texas, Fort Worth.

July 1, 1999.

Richard B. Schiro, Richard B. Schiro, Dallas, for Appellant.

Munsch Hardt Kopf & Harr, P.C., Mark M. Donheiser and Greg C. Noschese, Dallas, for Appellee.

PANEL B: DAUPHINOT, BRIGHAM, and HOLMAN, JJ.

## OPINION

WILLIAM BRIGHAM, Justice.

In this suit by depositors against a bank for improper payment of forged checks, Appellants Hatcher Cleaning Company and Richard B. Schiro contend the trial court erred in granting summary judgment to Appellee Comerica Bank—Texas. Because genuine issues of material fact exist with regard to the sufficiency of Ap-

pellants' notice to Appellee, we reverse and remand the case for trial.

## PROCEDURAL HISTORY

Appellants sued Appellee for breach of contract, negligence, breach of good faith and fair dealing, and breach of express and implied warranties, for wrongfully paying unauthorized checks forged by Appellants' bookkeeper. Appellee answered by general denial and asserted various affirmative defenses. After discovery, Appellee moved for summary judgment based on the pleadings, Appellants' responses to discovery, affidavits attached by Appellee, and accompanying exhibits, alleging untimely notice under section 4.406 of the Uniform Commercial Code ("UCC"). Appellants filed a response with affidavits and other summary judgment evidence. Appellee filed objections to certain summary judgment evidence, and a reply to Appellants' response. Upon hearing, the trial court entered a final summary judgment in favor of Appellee without specifying the ground or grounds relied upon. Appellants filed a joint notice of appeal.

Appellants contend the trial court erred in granting summary judgment. Points one through three, respectively, are reproduced verbatim:

> The trial court erred in granting the [b]ank's motion for summary judgment *when it ruled* that the Appellants' notice of forged signatures on checks paid/honored by [b]ank was not sufficient to meet the requirements of the statute in effect at the time the events occurred.
>
> The trial court erred in granting the [b]ank's motion for summary judgment *when it ruled* that no genuine issue of material fact was raised by the uncontroverted affidavit of the [b]ank's officer assigned to Appellant's accounts, which affidavit was filed in response to the [b]ank's motion for summary judgment.
>
> The trial court erred in granting the [b]ank's motion for summary judgment *when it applied* a statute which was not in effect at the time the events giving rise to this lawsuit occurred and, there-

fore, is not applicable to those events as a matter of law. [Emphasis added.]

Although Appellants' points appear to be framed to suggest that the summary judgment specified the grounds on which the trial court relied, the record indicates that it was granted on general grounds.

## STANDARD OF REVIEW

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. *See* TEX.R. CIV. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *See id.* The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See id.* The nonmovant may raise a genuine issue of material fact by showing that a reasonable jury could return a verdict in the nonmovant's favor. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (interpreting FED.R.CIV.P. 56); *see also* TEX.R. CIV. P. 166a(i) cmt (stating that the response "need only point out evidence that raises a fact issue on the challenged elements").

The burden of proof is on the movant; we resolve all doubts against the movant, and view the evidence and its reasonable inferences in a light most favorable to the nonmovant. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965).

■ When reviewing a summary judgment granted on general grounds, the appellate court considers whether any theories set forth in the motion will support the summary judgment. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995). Appellee's motion for summary judgment was grounded in a single theory that Appellants could not prove

the element common to each of their causes of action[1] because they are precluded under the UCC from asserting the items were unauthorized because they failed to timely notify Appellee within the period prescribed by law. Therefore, we will consider whether this theory supports summary judgment, viewing the evidence in a light most favorable to Appellants.

### SUMMARY JUDGMENT EVIDENCE

Appellant Hatcher is a Texas corporation, of which Appellant Schiro is the sole stockholder. Schiro is a Texas attorney. Appellants maintained four checking accounts with Appellee. Appellant Schiro was the only authorized signator. In early 1992, Appellants employed Richard M. King as a bookkeeper, whose job entailed writing checks for Appellant Schiro's signature and reconciling bank statements. King had no authority to sign checks on three of the accounts, but in June 1993 Appellant revised the signature card on the corporate account, adding King and another employee as authorized signators.[2]

King, without authority, obtained a stamp of Schiro's signature. In late 1992, King used the stamp to forge Schiro's signature on checks drawn on the accounts. Some of the checks were made payable to King and deposited into his account at another bank. Others were presented directly to Appellee by King and paid.

On July 14, 1995, Appellant Schiro first became aware of the scheme, and requested Appellee by facsimile to "immediately ... place a blanket stop pay order on the above-captioned *payroll account* for my law office." [Emphasis added.] Appellee did so. Over the next several months, Appellants or their employees requested copies of numerous checks and account statements from Appellee, because King had apparently destroyed many of the original checks and bank statements.

Appellant Schiro stated in his affidavit that "[i]n my first contact with a[b]ank employee on July 14, 1995, and continuing through all numerous, subsequent dealings and discussions with [b]ank personnel ... I communicated to the [b]ank *the fact of my unauthorized signature on many checks paid by the [b]ank* and the problems resulting therefrom." [Emphasis added.]

Michael R. Bennett, an employee of Appellee assigned to Appellants' accounts, stated in his affidavit in support of Appellants' response to motion for summary judgment:

3. In *mid-July, 1995*, Mr. Schiro informed me that his bookkeeper, Richard King ("King"), had been found to have forged checks on Mr. Schiro's account with [another bank]. In that first conversation Mr. Schiro told me he believed it was highly likely that King had also forged checks on the [a]ccounts [with Appellee].

4. Mr. Schiro instructed the [b]ank to *immediately* stop payment through his law office's payroll account, so that payment of any outstanding forged items would not occur. The [b]ank did this. The other [a]ccounts were closely monitored as to possible forgery of items presented for payment. The [b]ank cooperated with Mr. Schiro and [his] employees ... in either closing account(s) and opening new ones or monitoring existing accounts, all in an effort to prevent payment of additional forged items.

5. The [b]ank also cooperated with Mr. Schiro in regard to the forged items which had already been paid. *Over a period of several months following July, 1995, Mr. Schiro, either personally or through one of his employees, requested copies of numerous checks and state-*

---

1. Appellee alleged that the element common to all of Appellants' claims is that Appellee paid checks that were not properly payable because the checks were unauthorized and forged.

2. The authorization required the signatures of both King and the other employee on checks drawn on the corporate account.

ments for the [a]ccounts. I was aware, and I believe that other [b]ank employees were also aware, that (a) these requests for copies were in connection with King's scheme for forgery of Mr. Schiro's signature on checks drawn on the [a]ccounts, (b) the particular items (that is, checks) for which copies were requested were the specific checks on which Mr. Schiro believed his signature had been forged by King, (c) the [b]ank had paid these items forged on the [a]ccounts, and (d) Mr. Schiro or one of his entities had suffered financial losses as a result of these forged items having been paid. [Emphasis added.]

Also submitted with Appellants' response to the motion for summary judgment is the affidavit of Donald R. Harris, the bookkeeper employed by Appellants to correct their accounting records and to help identify which checks had been forged. Pertinent excerpts follow:

5. At various times I communicated with [b]ank employees *regarding the need for copies of particular checks and/or statements for the ... accounts. As an example, attached hereto as Exhibit 1, and incorporated herein in full for all purposes by this reference, is a copy of a fax transmission (with its attachments and proof of receipt) dated January 22, 1996, in my handwriting, to Mary Hussian ... at the [b]ank, requesting copies of checks on [one of the accounts]. I made a number of similar requests for this same type of copying for the other accounts on which forgeries had occurred.*

6. *There is no doubt in my mind that as a result of my conversations with various members of the [b]ank's staff the [b]ank was aware that (a) all of this activity involving these various accounts was required because of Mr. Schiro's signature having been forged, and (b) the items for which I requested copies were the specific items we believed had been forged.* [Emphasis added.]

Attached is the exhibit referenced, including a copy of the January 22, 1996 facsimi-

le transmission with a request for "copies of the cancelled [sic] checks on the items circled on the statements." Also attached are copies of six bank statements transmitted to Appellee with the facsimile request, with certain check numbers or groups of check numbers circled.

Hussian's affidavit states in relevant part:

3. In July 1995, I received a letter from [Appellants] asking Comerica to place a blanket stop-payment order *on all of their accounts.* A true and correct copy of that letter is attached as Exhibit "A". Comerica complied with this request. *Later that month, I also worked with [Appellants] in closing out their old accounts and setting up new accounts. During this time, [Appellants] never identified any specific items as forged or altered. To my knowledge, the the [sic] first notice that the bank received identifying specific items as allegedly forged or altered items [consisted of] demand letters received from [Appellants] in April, 1997.* [Emphasis added.]

Also attached to Hussian's affidavit are copies of the demand letters received by Appellee, identifying 31 unauthorized checks, 29 of which were alleged to have been unauthorized because they were stamped with the signature stamp.

Marge Owen stated in her affidavit that as an officer of the bank, she has personal knowledge that Appellee's employees, in the regular course of business, recorded and transmitted monthly bank statements and canceled checks to Appellants on the accounts, and that such information in the statements was available to Appellants for inspection on the day the statements were mailed. Copies of statements for the accounts, dating from December 1993 to July 1995, are attached to Owen's affidavit.

### CHECK FORGERY: CLAIMS AND DEFENSES

■ To determine the rights and duties of the parties, and how to allocate Appellants' losses, we look to applicable provi-

sions of the Texas Business and Commerce Code ("UCC").[3] Where the drawer's signature is forged, the drawer cannot be liable since his valid signature does not appear on the instrument. *See* TEX. BUS. & COM.CODE ANN. § 3.401 (Vernon Supp. 1999). A bank may only charge against a customer's account any item properly payable from that account. *See id.* § 4.401. A bank is presumed to know the signature of its depositor and may not charge the account for checks not signed by the depositor, no matter how artistic the forgery and regardless of whether the bank was negligent. *See McDowell v. Dallas Teachers Credit Union,* 772 S.W.2d 183, 188 (Tex. App.—Dallas 1989, no writ); *First Nat'l Bank v. Hackworth,* 673 S.W.2d 218, 223 (Tex.App.—San Antonio 1984, no writ).

Claims against a bank for unauthorized payment of an item are subject to certain statutory defenses. One such defense is found in former section 4.406, which places a duty upon the depositor to promptly examine his bank statement and report to the bank the discovery of any unauthorized signature or alteration. *See La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 561–62 (Tex.1984). It provides:

> Without regard to care or lack of care of either the customer or the bank a customer who does not *within one year* from the time the statement and items are made available to the customer [in accordance with Subsection (a) ] discover and *report* his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from

asserting against the bank such unauthorized signature or indorsement or such alteration.

Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 4.406, 1967 Tex. Gen. Laws 2343, 2459, *amended by* Act of May 28, 1995, 74th Leg., R.S., Ch. 921, § 4.406, 1995 Tex. Gen. Laws 4582, 4640 (current version at TEX. BUS. & COM.CODE ANN. § 4.406(f) (Vernon Supp.1999)) (emphasis added).[4] This places an absolute time limit of one year on the right of a customer to make a claim for payment of forged paper without regard to care or lack of care of either the customer or the bank. *See id.*

Appellants contend that a genuine issue of material fact exists, because their reports to the bank, consisting of repeated communications with bank employees or officers from July 14, 1995, and continuing "[o]ver a period of several months following July, 1995," wherein Appellants "requested copies of numerous checks and statements for the [a]ccounts,"[5] were sufficient and timely under section 4.406. In order to address this contention, we must determine how specific the report must be and whether the legislature intended it to be in writing. In doing so, we will necessarily address Appellee's contention, namely, that no genuine issue of material fact exists because Appellants' "statements to the bank that there may have been forgeries on unidentified checks in any of a number of accounts, were insufficient to satisfy [the requirements of section 4.406]."

## CONSTRUCTION OF "REPORT"

We find no definition of "report" in the UCC or in any Texas case. In con-

---

**3.** Prior to the UCC's enactment, banks were generally liable to the depositor for any amount of money paid on a forged check. *See American Indem. Co. v. First Nat'l Bank,* 94 S.W.2d 1258, 1261 (Tex.Civ.App.—Austin 1936, no writ); *see also First State Bank v. Oak Cliff Sav. & Loan Assoc.,* 387 S.W.2d 369, 373–74 (Tex.1965).

**4.** Significant revisions were made to the UCC in 1995, which became effective January 1, 1996. *See* Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 10, 1995 Tex. Gen. Laws

4582, 4643. The 1995 amendatory act provides that a right that accrues before the effective date of the act is governed by the law in effect on the date the right accrued. *See* TEX. BUS. & COM.CODE ANN. § 3.101 historical note. The parties' rights accrued on the dates the forged items were paid, and because the forged items were paid between 1992 and 1995, we will apply the then-existing UCC provisions.

**5.** These quoted excerpts are taken from the affidavit of Bennett, a bank employee.

struing its meaning, we are required to read the word in context and apply rules of grammar and common usage. *See* TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 1998). The main goal of statutory construction is to effectuate the intent of the legislature; words are to be given their common, everyday meaning unless they have acquired technical or particular meaning. *See R.R.E. v. Glenn*, 884 S.W.2d 189, 192 (Tex.App.—Fort Worth 1994, writ denied).

One dictionary defines the transitive verb "report" as "to make or present an account of, often officially, formally, or regularly." THE AMERICAN HERITAGE DICTIONARY 1049 (2d ed.1985). Another definition is "to give an account of: narrate, relate, tell." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1925 (1981). Given its plain meaning, the sentence can be understood to mean that a customer who does not relate, tell, or give an account of his unauthorized signature cannot assert it against the bank.

"Item" is defined as "any instrument for the payment of money even though it is not negotiable but does not include money." Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 4.104, 1967 Tex. Gen. Laws 2343, 2444, *amended by* Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 4.104, Tex. Gen. Laws 4582, 4627 (current version at TEX. BUS. & COM.CODE ANN. § 4.104(a) (Vernon Supp.1999)). Using "report" and "item" in context, then, we find that the legislature's intent can be expressed as follows: A customer who does not within one year from the time the statement and items[6] are made available to the customer, relate, tell, or give an account of his unauthorized signature or any alteration on the item is precluded from asserting a claim

for unauthorized payment against the bank.[7]

Although the report is not required to be written, we believe the legislature intended that the customer make known to the bank the specific item, or in this case, check, on which the unauthorized signature appears.[8] It follows that both the check and the account should be specifically identified. General references to a possible forgery are not sufficient "reports" of "items" under former section 4.406.

We reject Appellants' argument that in order to construe former section 4.406 we are obliged to consider its amended version. Although courts may consider, among other matters, legislative history and other versions of a statute, it is not necessary in this instance in order to give effect to the statute's plain meaning. *See* TEX. GOV'T.CODE ANN. § 311.023.

### SUFFICIENCY OF APPELLANTS' REPORTS

■ Having construed former section 4.406, we turn to the question of whether a genuine issue of material fact exists as to the sufficiency of Appellants' reports to Appellee. Their first notice consisted of a letter to Appellee, dated July 14, 1995, requesting a blanket stop payment order on the payroll account. Although the account is identified, there is no report of unauthorized forgeries and no identification of specific checks. Therefore, summary judgment as to this letter was proper.

■ The next reports made by Appellants' to Appellee consist of requests, some oral and some by facsimile, over a period of several months following the July 14, 1995 stop payment request. Account statements were forwarded to Appellee,

---

6. In this case, checks.

7. Although it is not clear from the language of the statute, there is no dispute that the report must be made to the bank.

8. This construction also gives effect to the word "item," in keeping with the cardinal

rule of statutory construction which requires that every sentence, clause, phrase and word be given effect if reasonably possible. *See Reames v. Police Officers' Pension Bd.*, 928 S.W.2d 628, 632 (Tex.App.—Houston [14th Dist.] 1996, no writ).

which identified the account and the check number of the item suspected to have been forged. The affidavit of Bennett, one of the bank employees, reveals that he was aware that the "requests for copies were in connection with King's [forgery] scheme." Appellants' bookkeeper made a number of written requests, attaching copies of bank statements with check numbers circled, an example of which was attached to his affidavit. We hold that Appellants' summary judgment evidence on these communications raises a genuine issue of material fact as to whether Appellants' reports were sufficient under former section 4.406. Appellants' first two points are sustained. It is not necessary to address their third point. We reverse the trial court's summary judgment as to these requests, and remand the case for trial.[9]

## CONCLUSION

Having sustained points one and two in part, and overruled them in part, we reverse and remand this case for trial.

---

9. It may be necessary for the parties to conduct additional discovery to identify the dates, contents, and circumstances of each and every report made by Appellants to Appellee. Only then will the trier of fact be able to determine whether they were sufficient under our rule announced today, and timely.